# Illinois Official Reports

## Appellate Court

***People v. Cervantes*, 2014 IL App (3d) 120745**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUSTIN CERVANTES, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0745 |
| Filed | December 3, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for the first-degree murder of a person he had been drinking with was reversed and the cause was remanded for a new trial where the trial court erred in admitting three of defendant's prior convictions for violent offenses as rebuttal evidence with respect to defendant's claim of self-defense; furthermore, regardless of the error with respect to the evidence of defendant's prior convictions, the instant conviction could have been reversed based on the denial of due process that occurred when a sentence that was "tantamount" to a life sentence was imposed based on the judge's private investigation of life expectancy tables without allowing either party to review or evaluate the source of the court's information or test that information by cross-examination. |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 11-CF-957; the Hon. Stephen Kouri, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Mark D. Fisher (argued), of State Appellate Defender's Office, of Ottawa, for appellant.

Jerry Brady, State's Attorney, of Peoria (Mark A. Austill (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE WRIGHT delivered the judgment of the court, with opinion.
Justice McDade concurred in the judgment and opinion.
Justice Holdridge dissented, with opinion.

**OPINION**

¶ 1    Following a jury trial, defendant, Justin Cervantes, was convicted of first-degree murder. On appeal, defendant first contends the trial court erred when it allowed the State to introduce evidence of defendant's prior convictions for a purpose unrelated to impeachment. Second, defendant argues the trial court erred when it instructed the jury it could consider defendant's previous convictions for violent offenses when deciding whether defendant used justifiable deadly force against the victim in self-defense. Finally, defendant contends the trial court committed error by imposing a sentence "tantamount" to a life sentence based on the court's personal review of life expectancy tables. We reverse and remand for a new trial.

¶ 2                                                   FACTS

¶ 3    On October 25, 2011, the State charged defendant by superseding indictment with two counts of first-degree murder for the death of Sven "Gus" Mundt. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2010). Defendant notified the State on April 27, 2012, he intended to present self-defense as an affirmative defense.

¶ 4    Defendant's trial began on July 16, 2012, and continued through July 19, 2012. Peoria police officer Shannon Walden testified that, on October 6, 2011, at 11:57 a.m., he responded to a report of a stabbing and detained defendant, who matched the suspect's description, near the scene of the offense.

¶ 5    Katherine Modugno testified that on the evening of October 5, 2011, she was drinking and partying at her house, located at 124 Northeast Rock Island, with Marcus "Ponytail" Matthews, Terrance "Shotgun" Glover, and the victim, Sven "Gus" Mundt. The following morning, Modugno woke up between 10 and 10:30 a.m., and noticed the victim was in the house, along with a man she did not know, who she later learned to be defendant. Modugno went back to sleep 20 or 30 minutes later, only to be awakened by Matthews, who told her the victim had been stabbed and urged her to get out of the house. On her way out the back door, Modugno observed the victim "laid back" in a chair by the front door and it "didn't look like he

- 2 -

was alive." While waiting for police to arrive, Modugno observed a "very agitated" defendant in front of her neighbor's house yelling, " 'you want some more[?]' "

¶ 6    Marcus Matthews testified that just before the stabbing, defendant consumed a pint of vodka when defendant "jumped up," walked toward the victim, and asked the victim if he was "ready." The victim responded, "go on, man, go on." Matthews saw defendant put his left hand on the victim's forehead and strike the victim in the chest with his fist. Matthews "thought it was a buddy hittin' his buddy in the chest." Matthews testified that after defendant hit the victim, the victim laughed and continued to eat his noodles. After the "fourth or fifth time," defendant heard the victim say "oh man, you serious." Matthews testified he did not see the victim hit defendant during the confrontation. Matthews saw defendant hit the victim again, which caused the victim to fall back in the chair. At this point, Matthews saw blood on the victim's chest and awakened Modugno. On his way out of the house, Matthews saw defendant standing over the victim, but the chair had leaned backward and the victim was falling. After leaving the house with Modugno, Matthews could hear defendant "walkin' down the street hollering at somebody."

¶ 7    Terrance "Shotgun" Glover's testimony was substantially similar to Matthews' version of the events. Glover testified that, while the four men sat around watching TV and drinking, defendant stood up and walked toward the victim, who was standing by the front door. According to Glover, defendant "went over there and stabbed [the victim]." Glover testified he thought defendant was playing with the victim, "but then he kept doin' it" and Glover noticed the victim was bleeding. Glover did not hear the victim or defendant say anything during the confrontation. Glover left the house through the back door, told Modugno to call the police, and then walked back into the house when he heard the police coming.

¶ 8    Peoria police officer Scott Bowers testified he responded to a reported stabbing at 124 Northeast Rock Island on October 6, 2011. Officer Bowers testified he did not notice any signs of a struggle in the home, but observed "castoff" blood, along with blood smears and drops of blood, on the inside of the closet door.

¶ 9    Dr. John Denton, a coroner's forensic pathologist, testified he performed the victim's autopsy on October 7, 2011. Dr. Denton reviewed the victim's X-rays and observed a piece of a metal knife tip embedded in the bone of the right forearm. Dr. Denton observed 23 or 24 cutting and stab wounds, including 3 to the victim's chest. One "oval type" stab wound was located just below the victim's collarbone and punctured his aorta. The victim suffered a similar oval stab wound near his left nipple, which traveled through the pericardium and into the left ventricle of the heart. According to Dr. Denton, the victim would have been conscious for one minute, at the most, and dead within a few minutes, after receiving those two stab wounds. Dr. Denton observed a third oval stab wound in the victim's lower chest, which punctured the chest cavity. According to Dr. Denton, this wound, if not treated, would be fatal. Dr. Denton explained to the jury these types of injuries could have been caused by a pair of scissors.

¶ 10   Dr. Denton also observed multiple "cutting or sharp force injuries" to the victim's hands, right forearm, and left forearm, which were caused by a knife. Dr. Denton testified the victim's left forearm showed two stab wounds that evidenced defensive wounds. Dr. Denton testified it would take a great deal of force to put a cutting instrument all the way into the bone. Dr. Denton told the jury the knife tip discovered in the victim's arm was inconsistent with the oval chest wounds. Dr. Denton therefore concluded different instruments were used to cause the

- 3 -

victim's injuries. The victim's blood tested positive for the presence of alcohol, products of cocaine, and nicotine.

¶ 11    Debra Minton, a forensic scientist, testified she conducted DNA analysis on a bloodstain from defendant's jeans, the standard taken from the victim during his autopsy, and defendant's buccal swab standard. Minton testified the DNA from a bloodstain from the back of defendant's jeans matched the victim's profile.

¶ 12    After the State rested, defendant testified on his own behalf. Defendant testified he pled guilty to a 2001 violation of an order of protection, pled guilty in 2006 to aggravated battery, and pled guilty in 2008 to aggravated battery. Defendant testified he was 42 years old and had known the victim for 20 or 30 years, but the two did not become friends until the summer of 2011, when they were both in rehab.

¶ 13    On the night of October 5, 2011, defendant testified he ran into the victim at the store. Through some "wheeling and dealing," defendant obtained a gallon of Jack Daniels and a half gallon of Kesslers (whiskey). After defendant passed out, he awoke early the next morning and started to search for his whiskey. The victim explained to defendant that defendant was "so drunk" defendant gave the whiskey to the victim. This explanation made defendant angry. Later, a friend drove both the victim and defendant to a store where the victim bought beer and advised defendant to head to 124 Northeast Rock Island. Defendant arrived at 124 Northeast Rock Island, around 8 a.m. on October 6, and he could hear the victim, and a man defendant later learned to be Matthews, inside yelling at each other. Glover opened the door for defendant and gave him a beer. According to defendant, Matthews, the victim, and Glover left for a few minutes and returned with a four-pack of beer and a half pint of vodka.

¶ 14    Defendant testified he and the victim started arguing "[a]nd I got up and he got up. We were like standing facing each other and that's when he punched" defendant on the right side of his face. Defendant "hit [the victim] and I grabbed at him, and next thing I know [the victim's] got a knife in his hand." Defendant grabbed at the victim's hand and the victim put his right hand around defendant's throat. Defendant then pulled out a knife with his left hand. Defendant tried to stab at the victim's arm "to make him drop the knife" as the two moved backward toward the closet. The knife broke off in the victim's right arm when the victim tried to reach across to grab defendant's hand. During this time, the victim told defendant, "I'll kill you motherfucker." Defendant testified he stabbed the victim in the arm, but the victim would not let go of the knife. The victim's "arm came up and so I just stabbed him up underneath here. And then he went down and then I just–I dropped the knife and ran out the house" through the front door. Defendant testified he walked away from the house unsure of his destination, but then decided to head home.

¶ 15    Defendant told the jury he believed the victim was going to kill him "because of the way he was being aggressive toward me and because of what he had told me." Defendant testified he did not intend to kill the victim, but stabbed him because he was "fighting for [his] life." Defendant knew the victim always carried a knife. Defendant acknowledged both he and the victim were drunk when the fight occurred. Defendant denied asking the victim "you ready for it?" and insisted they both jumped up with their "chests puffed out at each other" and started fighting. Defendant acknowledged he did not have any injuries after the fight. Defendant denied having any other weapon on him the day of the incident and told the jury the knife caused the injuries on both the victim's chest and arms.

¶ 16 The defense then called Terry Burnett, who testified he had known both defendant and the victim since they were kids. Without objection from the State, Burnett testified to the victim's prior out-of-court statement to defendant while all three men were in rehab together in 2011. According to Burnett's testimony, he heard the victim tell defendant during an argument with defendant, "that if they get into it he better fight him to kill him because that's how he was gonna fight him." Burnett testified he told investigators both defendant and the victim were known to carry screwdrivers or knives with them and when they became intoxicated "they're both a couple of idiots."

¶ 17 During the jury instructions conference, which occurred before the State presented rebuttal evidence, defendant offered defendant's instruction No. 1, Illinois Pattern Jury Instructions, Criminal, No. 3.13 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 3.13). Thereafter, the following discussion with the court occurred:

"THE COURT: *** Defendant's No. 1. Any objection to Defendant's No.1, State?

[PROSECUTOR]: We don't have an objection to it, but if some of our rebuttal evidence is allowed, which is certified convictions of the defendant's prior violence [*sic*] offenses, we would want it modified somewhat.

THE COURT: To say what?

[PROSECUTOR]: To say that however this evidence, evidence of his prior violent offenses can be used against him to determine who is the initial aggressor.

[DEFENSE COUNSEL]: I'd be objecting to that, your Honor. I mean, it's up to the jury to determine from the testimony they heard.

THE COURT: Anybody want to add anything else?

[PROSECUTOR]: I'll make an offer of proof as to what would be coming in. We have certified copies of all of these convictions. One is 96-CM-714 which is a conviction for battery.

[DEFENSE COUNSEL]: That's out of the range of *Montgomery*, '96.

[PROSECUTOR]: If I could finish my offer of proof. We're not entering this for purposes of *Montgomery*. We're entering it for purposes of who is the initial aggressor. Under *People v. Harris*, I have this case that I'll provide. 224 Ill. App. 3d 649. It's a Third District case. When theory of self-defense is raised, in this case it was a battery case, but when theory of self-defense is raised, evidence of peaceful or violent character of either accused or victim may be relevant as circumstantial evidence to show which party was the initial aggressor. Evidence of specific instances of conduct probative of the violent character of either party may be admissible.

Furthermore, in *People v. Lynch*, which is the Supreme Court case dealing with self-defense, in that situation it was the defense that wanted to enter in three prior battery convictions, and the trial court didn't allow it. It went all the way up to the Supreme Court, and the Supreme Court said yes because convictions for battery are reasonably reliable evidence of a violent character; and that once self-defense is an issue that becomes relevant to the determine [*sic*] who is the initial aggressor.

Now, the defense is trying to get in the victim['s propensity for violence], but in *Harris* they said it doesn't matter which party. So we certainly have the right, just like the defense was able to put on those other defense witnesses to talk about other threats

- 5 -

that our victim made, we get to put on evidence of either prior threats or prior instances, including convictions. So that's the case law to support our position."

¶ 18    The State asked the court to allow it to submit evidence of six convictions as substantive evidence. These convictions included: a 1996 conviction for battery, a 1997 conviction for domestic battery, a 1997 conviction for aggravated assault, a 2000 conviction for domestic battery, a 2007 conviction for aggravated assault, and a 2011 conviction for disorderly conduct.[1] The State continued:

"Again, it's not for *Montgomery* purposes. It's not for impeachment. The defendant admitted his felonies that go to impeachment. These would be a separate issue. These come in to show, as evidence to show who is the initial aggressor. We have a dispute over those facts right now. The witnesses that testified for the State said the defendant was. The defendant, some versions that he testified to, said the victim was the initial aggressor. So it is in dispute, and, as such, evidence of violent character is admissible.

It's admissible on either side. Just as it came in for our victim, it comes in for the defense now, too."

¶ 19    Defense counsel argued that evidence of these convictions would be cumulative and highly prejudicial. After further discussion, the State argued that once defendant introduced evidence that the victim had a history of violence or was the initial aggressor, the State was permitted to offer rebuttal evidence showing defendant had a history of violence. The State continued, once defendant "puts self-defense in, that triggers [the State's] ability to bring in his violent nature." The State argued, "once the defendant testified, it's admissible."

¶ 20    Concerned that IPI Criminal 4th No. 3.13 should not be modified as the State requested, the court directed the parties to review IPI Criminal 4th No. 3.12X and consider giving both instructions. The court noted that it "seems to [the court] like it's not a 3.13 modified instruction. It's 3.12X and 3.13, and "[e]ven the comment that 3.12X says you give this with 3.13." The judge stated, "I, also, think the evidence suggests that it should be given against the defendant and against the victim."

¶ 21    The court then discussed whether IPI Criminal 4th No. 3.12X should be modified to include both defendant and the victim, or if two separate instructions should be given with each name separately. When the court asked defense counsel her position, she replied, "If you're going to include it with respect to [defendant], I certainly then want that included against [the victim] because of the testimony that came through ***." Defense counsel argued IPI Criminal 4th No. 3.13 should not be modified and IPI Criminal 4th No. 3.12X should not be given at all. The court allowed defendant's instruction No. 1, based on IPI Criminal 4th No. 3.13. In addition, the court allowed People's instruction No. 22, based on a modified version of IPI Criminal 4th No. 3.12X, to be included, over defendant's objection, reflecting that IPI Criminal 4th No. 3.12X applies to both the victim and defendant. In addition, the court determined that, out of the six convictions the State sought to introduce, only the 1996 battery conviction, the 1997 domestic battery conviction, and the 2000 domestic battery conviction should be admitted as evidence of defendant's violent nature.

---

[1]The convictions sought to be admitted by the State as substantive evidence were separate from the three convictions (conviction for a 2001 violation of an order of protection offense, and 2006 and 2008 convictions for aggravated battery) admitted by defendant, during his testimony, for impeachment purposes.

¶ 22		The trial continued with John Hayes, who testified on behalf of defendant. Hayes stated he had known the victim for 20 to 30 years and knew the victim always carried a box cutter, a buck knife, or a screwdriver.

¶ 23		After the defense rested, over defendant's objection, the court admitted the State's rebuttal evidence establishing defendant's three prior misdemeanor convictions for a 1996 battery, a 1997 domestic battery, and a 2001 domestic battery.

¶ 24		Prior to closing arguments, the prosecutor requested the language "prior acts of violence" contained in IPI Criminal 4th No. 3.12X be changed to "prior threats of violence" based on the testimony presented during the trial as it related to the victim. The parties and court agreed, and the court allowed the amended language. After closing arguments, the court instructed the jury regarding the law as it related to defendant's prior misdemeanor convictions, in relevant part:

> "In this case, the State must prove beyond a reasonable doubt the proposition that the defendant was not justified in using the force which he used. You have received evidence of the defendant's prior convictions of a violent crime. It is for you to determine whether the defendant was convicted. If you determine that the defendant was convicted you may consider that evidence in deciding whether the State has proved beyond a reasonable doubt that the defendant was not justified in using the force which he used.
>
> Evidence of a defendant's previous conviction of an offense may be considered by you only as it may effect [*sic*] his credibility as a witness and must not be considered by you as evidence of his guilt of the offense with which he is charged."

¶ 25		The jury found defendant guilty of first-degree murder on July 19, 2012. On August 20, 2012, defendant filed a motion for new trial arguing, among other things, the trial court erred when it allowed the State to introduce evidence of defendant's prior misdemeanor convictions for battery from 1996 and domestic battery from 1997 and 2000. On August 30, 2012, the court denied defendant's motion for new trial and proceeded to the sentencing hearing.

¶ 26		After hearing testimony, the trial court heard arguments. The State argued defendant should be sentenced to the "top" end of the 20- to 60-year sentence he faced as a result of his conviction. After defense counsel presented her argument, the trial court stated, "I need about two or three minutes and I'll be right back. I want to look something up relative to this." Upon returning to the bench, the trial judge announced he considered the presentence investigation report, defendant's statement of allocution, evidence and arguments, the statutory factors in aggravation and mitigation, the history and character of defendant, and the circumstances and nature of the offense. The court noted:

> "Some of these cases are easy, I hate to say it, not the subject matter but the sentencing part sometimes are easy, but this one is not. What I looked up was life expectancy tables. I'm going to sentence [defendant] to what his life expectancy is expected to be. If he survives that, through the grace of God, then he'll have some time of freedom on this earth and if he doesn't then he won't."

The trial court entered judgment only on count I and sentenced defendant to 33 years in the Illinois Department of Corrections followed by a 3-year term of mandatory supervised release. On September 4, 2012, defendant filed a motion to reconsider sentence, which the trial court denied. Defendant appeals.

ANALYSIS

On appeal, defendant first contends he is entitled to a new trial because the trial court misapplied the law by allowing rebuttal evidence of defendant's prior convictions. Defendant also contends the trial court improperly provided the jury with a modified IPI Criminal 4th No. 3.12X jury instruction informing the jury it could consider the defendant's prior convictions for violent offenses when deciding whether defendant was justified in using deadly force. Finally, defendant argues on appeal the matter should be remanded for resentencing because his sentence was "tantamount" to a life sentence after the trial court improperly considered life expectancy tables the court independently researched during the sentencing hearing.

The State concedes People's instruction No. 22, the modified IPI Criminal 4th No. 3.12X, was erroneous, but argues the error was invited by defendant or, alternatively, constituted harmless error. The State contends the trial court properly sentenced defendant to 33 years' incarceration.

## I. Admission of Defendant's Prior Convictions

First, we consider whether the trial court improperly allowed the State to introduce certified copies of defendant's three prior misdemeanor convictions for battery in 1996, domestic battery in 1997, and domestic battery in 2000, for the jury's consideration as substantive evidence. This court reviews *de novo*, a trial court's decision to admit evidence based solely on the interpretation of case law. *DiCosolo v. Janssen Pharmaceuticals, Inc.*, 2011 IL App (1st) 093562, ¶ 32.

Relying on *People v. Lynch*, 104 Ill. 2d 194 (1984), and *People v. Harris*, 224 Ill. App. 3d 649 (1992), the trial court allowed the State to introduce certified copies of defendant's 1996, 1997, and 2000 misdemeanor convictions for crimes of violence over defendant's objection. The court determined the prior convictions constituted admissible rebuttal evidence, counterbalancing defendant's evidence the victim had a history of making threats of violence and, therefore, may have been the initial aggressor in this self-defense case.

The case law provides that when the theory of self-defense is raised, the *victim's* violent character becomes relevant to which party may have been the initial aggressor. *Lynch*, 104 Ill. 2d at 200. In *Harris*, relying on *Lynch*, this court reversed the conviction based on the trial court's admission of evidence concerning defendant's prior violent crime convictions. Our court held "when the theory of self-defense is raised the relevancy of the defendant's prior convictions for crimes of violence outweighs the prejudicial effect of such convictions *only when the defendant clearly puts his character in issue* by introducing evidence of his good character to show that he is a peaceful person." (Emphasis added.) *Harris*, 224 Ill. App. 3d at 653.

In the case at bar, the defense presented testimony from Terry Burnett indicating the victim previously threatened that if defendant ever wanted to fight the victim, defendant should "fight to kill" the victim "because that's how [the victim] was going to fight [defendant]." In addition, Burnett and another defense witness testified the victim was known to carry a screwdriver or knife with him. This defense strategy focused on the *victim's* less than peaceful nature, but did not attempt to prove defendant's peaceful nature. In fact, a defense witness testified both defendant and the victim acted like "idiots" when they were intoxicated. The case law makes it clear prior bad acts by the accused are inadmissible in a self-defense case *unless* the defense

introduces some affirmative evidence of defendant's peaceful character. *People v. Harris*, 224 Ill. App. 3d 649.

¶ 35    The State suggests when a defendant "remains silent about his own character at trial he is suggesting to the jury that he is peaceable because the jury has heard nothing to contradict that conclusion." The State's argument ignores, and is contrary to, the presumption of innocence and the right to remain silent. We reject the notion that an accused places his peaceful character at issue by remaining silent, as the State suggests. As a result, we conclude the trial court misconstrued well-established case law when it determined defendant's three prior misdemeanor convictions for violent offenses from 1996, 1997, and 2000, constituted admissible, substantive, rebuttal evidence under these circumstances.

¶ 36    It is well established that the erroneous admission of evidence of other crimes evidence, such as that in the case at bar, creates a high risk of prejudice and ordinarily calls for reversal. *People v. Harding*, 401 Ill. App. 3d 482, 490 (2010). In addition, the trial court's evidentiary error was further magnified by the court's suggestion that the State should submit a modified version of IPI Criminal 4th No. 3.12X, People's instruction No. 22, for the court's consideration. This instruction stated:

> "In this case, the State must prove beyond a reasonable doubt the proposition that the defendant was not justified in using the force which he used. You have received evidence of the defendant's prior convictions of a violent crime. It is for you to determine whether the defendant was convicted. If you determine that the defendant was convicted you may consider that evidence in deciding whether the State has proved beyond a reasonable doubt that the defendant was not justified in using the force which he used."

¶ 37    Here, the State presented three prior convictions as rebuttal evidence with respect to the issue of self-defense. Yet, during defendant's testimony he preemptively admitted three unrelated previous felony convictions for impeachment purposes. People's instruction No. 22, based on the modified version of IPI Criminal 4th No. 3.12X, did not restrict the jury from considering all six convictions as substantive evidence of defendant's violent character. Consequently, we agree with the defense that defendant's conviction must be reversed and remanded for a new trial.

¶ 38                                    II. Defendant's Sentencing Hearing

¶ 39    Although we remand this case for a new trial as discussed above, we would be remiss if we did not note that the trial court also, *sua sponte*, injected reversible error into this record for a second time during defendant's sentencing hearing. Defendant acknowledges he forfeited the sentencing issue for this court's review, but asserts this court should reach the issue pursuant to the plain error doctrine.

¶ 40    Although not outcome determinative, we elect to address defendant's final contention on appeal concerning the sentencing hearing since this issue is likely to reoccur. Defendant contends this trial judge has a "personal policy" of imposing life sentences on defendants convicted of murder. However, based on defendant's conviction for first-degree murder, defendant was not eligible to receive a life sentence. See 730 ILCS 5/5-4.5-20 (West 2010). Consequently, the trial court designed a sentence "tantamount" to a life sentence and

conducted a private investigation of life expectancy tables applicable to defendant, in order to do so.

¶ 41    The State responds this court should honor defendant's forfeiture. Alternatively, the State argues the trial court did not use the life expectancy tables as the basis for its sentence and, instead, the trial court relied on only the proper statutory considerations before sentencing defendant.

¶ 42    Next, we consider whether the plain error doctrine applies in the case at bar. We can excuse forfeiture when (1) the evidence was closely balanced, or (2) the error was so serious it affected the fairness of defendant's trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step in plain error is to determine whether error occurred at all. *People v. McNeal*, 405 Ill. App. 3d 647, 670 (2010).

¶ 43    Plain error applies under the second prong when the error violated defendant's constitutional right to due process of law. See *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 7 (a serious error occurs when a trial court considers erroneous aggravating factors in determining defendant's sentence because the defendant's "fundamental right to liberty" is unjustly affected (internal quotation marks omitted)). For good reason, any determination made by the trial judge based upon his private investigation or based upon his private knowledge, untested by cross-examination, constitutes a denial of due process of law. *People v. Dameron*, 196 Ill. 2d 156, 176 (2001).

¶ 44    The question of whether a court relied on an improper factor when imposing a sentence ultimately presents a question of law to be reviewed *de novo*. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8. When determining the correctness of a sentence, the reviewing court should not focus on a few words or statements made by the trial court, but should consider the record as a whole. *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007). An isolated remark made in passing, although improper, does not necessarily require that defendant be resentenced. *Id.* Rather, defendant must show the trial court relied on the improper fact when imposing defendant's sentence. *Id.*

¶ 45    In this case, neither party introduced evidence of the life expectancy tables for the trial court's consideration during defendant's sentencing hearing. Perhaps not satisfied with the State's sentencing argument, the trial judge took the liberty of conducting his own research, prior to announcing defendant's sentence.

¶ 46    The record reveals that after the arguments from counsel, the judge left the courtroom to "look something up relative to this." When he returned to the bench, the trial judge stated, "[w]hat I looked up was life expectancy tables. I'm going to sentence [defendant] to what his life expectancy is expected to be." The court took a recess, returned to the bench, announced he "looked up" defendant's life expectancy, and then sentenced defendant to serve a term of incarceration equal to "what [defendant's] life expectancy is expected to be." We need not speculate about whether the court relied on the life expectancy tables because his actions and his words were clear. Therefore, we respectfully observe the State's contention that the trial court did not rely on its *sua sponte* review of the life expectancy tables is unsupported by this record and seems disingenuous. We conclude reversible error occurred.

¶ 47    Clearly, neither party asked the court to consider defendant's life expectancy and neither party had the opportunity to review or evaluate the source of the court's information. For good reason, any determination made by the trial judge based upon his private investigation or based upon his private knowledge, untested by cross-examination, constitutes a denial of due process

of law. *Dameron*, 196 Ill. 2d at 176. On this basis, we conclude plain error occurred during the sentencing hearing. Although we reverse defendant's convictions based on errors that occurred during his jury trial and remand the matter for a new trial, we would also reverse defendant's sentence of 33 years' imprisonment based on the court's conduct which violated defendant's right to due process and strongly discourage the trial court from conducting its own independent research in the future.

¶ 48                                    CONCLUSION
¶ 49        For the foregoing reasons, the judgment of the circuit court of Peoria County is reversed and the matter is remanded for a new trial.

¶ 50        Reversed and remanded.

¶ 51        JUSTICE HOLDRIDGE, dissenting.
¶ 52        I would affirm the defendant's conviction and sentence. First, I would find that the trial court did not improperly allow the State to introduce certified copies of the defendant's three prior misdemeanor convictions for battery in 1996, domestic battery in 1997, and domestic battery in 2000 for the jury's consideration as substantive evidence. This evidence was clearly relevant as to whether the victim or the defendant was the initial aggressor, the key element in the defendant's self-defense argument. The admissibility of other crimes evidence will usually not be disturbed absent a clear abuse of discretion (*People v. Wilson*, 214 Ill. 2d 127, 136 (2005)); however, where the trial court's ruling to admit evidence is based solely upon an interpretation of relevant decisional law, the matter is reviewed *de novo*. *Napcor Corp. v. JP Morgan Chase Bank, NA*, 406 Ill. App. 3d 146, 155 (2010). In the instant matter, the trial court allowed admission of the defendant's prior criminal convictions based upon its understanding of the holdings in *People v. Lynch*, 104 Ill. 2d 194 (1984), and *People v. Harris*, 224 Ill. App. 3d 649 (1992). Specifically, the trial court determined that these prior convictions constituted admissible rebuttal evidence challenging the defendant's self-defense claim that the victim may have been the initial aggressor.
¶ 53        As the majority points out, *Lynch* stands for the proposition when the theory of self-defense is raised, the *victim's* character becomes relevant as to which party may have been the initial aggressor. *Lynch*, 104 Ill. 2d at 200. In *Lynch* our supreme court held that where self-defense is raised in a murder prosecution, evidence that the victim had been convicted of battery was admissible. *Id*. While our supreme court was clear that the victim's prior convictions were probative where self-defense is raised, it did not address the issue of whether the defendant's prior convictions are equally probative when the issue of initial aggression arises in a self-defense context. That question has only been addressed in two appellate decisions: *People v. Devine*, 199 Ill. App. 3d 1032 (1990), and *People v. Harris*, 224 Ill. App. 3d 649 (1992).
¶ 54        In *Devine*, this court held that the prosecution may not initially introduce evidence of bad character against a defendant, unless "the defendant initially introduces evidence that the victim had a violent character and that he was a peaceful person." *Devine*, 199 Ill. App. 3d at 1037. In such cases, this court held, "the interests of fairness require that the prosecution be allowed to rebut this portrayal by the defendant." *Id*. The court further noted that when the

- 11 -

theory of self-defense is raised in a battery or homicide case "evidence of the peaceful or violent character of either party is relevant as circumstantial evidence to show whether the [victim] or the accused was the initial aggressor." *Id.* at 1036. The *Devine* court then held that, despite the fact that the defendant has placed the peaceful or violent character of the victim at issue by raising self-defense, the prosecution may still introduce evidence of the defendant's violent nature "only if the defendant first opens the door by introducing evidence of good character to show that he is a quiet and peaceful person." (Internal quotation marks omitted.) *Id.* Similarly, in *Harris*, this court held that "when the theory of self-defense is raised the relevancy of the defendant's prior convictions for crimes of violence outweighs the prejudicial effect of such convictions only when the defendant clearly puts his character in issue by introducing evidence of his good character to show that he is a peaceful person." *Harris*, 224 Ill. App. 3d at 653.

¶ 55      The holdings in *Devine* and *Harris* are at odds with the notion that self-defense necessarily places the character for violence of both victim and defendant at issue. When self-defense is at issue, the question of who was the initial aggressor is relevant. *Lynch*, 104 Ill. 2d at 200. The State argues that when a defendant raises an initial aggressor self-defense argument but remains silent about his character at trial he is suggesting to the jury that he is peaceable because the jury has heard nothing to contradict that conclusion. I agree. It is simply illogical and unfair to allow the defendant to put on evidence of the victim's past violent acts as evidence that he was the initial aggressor and at the same time allow the defendant to prevent the same evidence of his prior acts by simply not addressing his own violent or peaceful nature. If, as the court held in *Lynch*, evidence of violent or aggressive character is relevant in determining the aggressor, then both sides must be able to place that evidence before the jury. To allow the defendant claiming self-defense to attack the character of the victim while preventing the prosecution from presenting evidence of the defendant's own violent or aggressive character would allow the defendant to mislead the jury on the key factual question in a self-defense case, *i.e.*, the initial aggressor. It should be remembered that the People are also entitled to a fair trial. *People v. Kuhfuss*, 241 Ill. App. 3d 311, 317 (1993).

¶ 56      To the extent that *Devine* and *Harris* stand for the proposition that where self-defense is raised and the identity of the initial aggressor is at issue the defendant's prior convictions for violent crimes cannot be placed in evidence unless the defendant chooses to do so, I would hold that those cases are wrongly decided. The correct rule of law should be that when a defendant raises self-defense and introduces evidence of the victim's violent or aggressive character, the prosecution should be able to introduce evidence of the defendant's violent or aggressive nature. By raising self-defense and accusing the victim of acts of violence and aggression, the defendant has placed his own character at issue. To hold otherwise would be to impede the search for justice. I would also note that allowing evidence of a defendant's prior convictions for violence crimes where he has raised an initial aggressor self-defense argument does not impair the presumption of innocence or the right to remain silent. Federal Rule of Evidence 404(a)(2)(B) provides that "a defendant may offer evidence of an alleged victim's pertinent trait, and if the evidence is admitted, the prosecutor may: (i) offer evidence to rebut it; and (ii) offer evidence of the defendant's same trait." Fed. R. Evid. 404(a)(2)(B).

¶ 57      I would, therefore, affirm the trial court's ruling allowing the prosecution to introduce evidence of the defendant's prior convictions for violent crimes.

¶ 58    I would also affirm the sentence imposed by the trial court. A trial judge's sentencing decision will not be altered on appeal absent an abuse of discretion. *People v. Reed*, 376 Ill. App. 3d 121, 127 (2007). A trial court's sentencing decision is presumed to be correct. *Id*. at 128. Only where that presumption has been rebutted by an affirmative showing of error will a reviewing court find that a trial court has abused its discretion. *Id*. In the instant matter, the majority finds error in the trial court's sentence where it appeared to have based its sentencing decision on a private investigation into life expectancy tables. I would find that the issue has been waived and does not constitute plain error for purposes of review. However, since the majority has addressed the issue, I write to express my disagreement with the majority's conclusions.

¶ 59    A finding that the trial court *relied* on life expectancy tables to reach its sentencing conclusion is not supported by the record. The record established that the trial court stated its reliance upon the presentence investigation report, the evidence and arguments presented by the parties, the statement of allocution made by the defendant, the statutory factors in aggravation and mitigation, the history and character of the defendant, and the circumstances and nature of the offense. The court also made specific note of several victim impact statements, most notably the statement given by the victim's mother. These are all appropriate sentencing factors. It was in the context of those statements that the brief discussion of life expectancy tables occurred.

¶ 60    The reference to life expectancy tables came as single comment when the court was addressing the somewhat philosophical nature of doing justice when faced with the conflicting nature of statements in support of the defendant as opposed to those victim impact statements. The court's statement regarding life expectancy tables previously quoted by the majority is preceded by:

> "In the letter, and this happens, and this happens frequently, I'll get a statement in the letter *** where someone writing a letter in support of the defendant will say 'please give him the minimum' *** and someone writing a letter essentially on behalf of the victim stating 'please give the maximum.' *** The defendant has had some situations in his life. I can't fix those. The victim was killed. I can't fix that. My job is *** to try to do justice where there is no remedy that can adequately do justice to all of this."

¶ 61    When the trial court's statement about life expectancy is viewed in the complete context, it is clear that the court did not consider those tables in arriving at the sentence. Rather, the court merely noted, in passing, that the 33-year sentence in this case did justice by balancing the loss of the victim's life with the possibility that the defendant would not survive the entire sentence. Taken in this context, there is nothing in this record to establish that the court impermissibly considered a fact outside the record in reaching its sentencing decision. On that basis, I would affirm the sentence.