# Illinois Official Reports

## Appellate Court

---

### *People v. Rademacher*, 2016 IL App (3d) 130881

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY J. RADEMACHER, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-13-0881 |
| Opinion filed<br>Modified upon<br>denial of rehearing | April 4, 2016<br><br>August 1, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Iroquois County, No. 05-CF-87; the Hon. Gordon L. Lustfeldt, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier and James Ryan Williams, both of State Appellate Defender's Office, of Springfield, for appellant.<br><br>James A. Devine, State's Attorney, of Watseka (Dawn D. Duffy, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHMIDT delivered the judgment of the court, with opinion.<br>Justice Holdridge concurred in the judgment and opinion.<br>Justice Wright specially concurred, with opinion. |

**OPINION**

¶ 1 Defendant, Timothy J. Rademacher, appeals the first-stage dismissal of his *pro se* postconviction petition. On appeal, defendant argues that his petition stated the gist of a constitutional claim. We affirm.

¶ 2                                                    FACTS

¶ 3 Defendant pled guilty to predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2004)) and criminal sexual assault (720 ILCS 5/12-13(a)(4) (West 2004)). In exchange for defendant's plea, the State agreed to an aggregate sentencing range of 12 to 35 years' imprisonment on the mandatorily consecutive sentences. As the factual basis for the plea, the parties agreed that if the case proceeded to trial, B.B. would testify that he had sexual intercourse with defendant at the church's parsonage in September 2002, when B.B. was 13 years old. Further, the parties agreed that C.L. would testify that he had sexual intercourse with defendant in the parsonage between January 2003 and June 2005, when he was under 13 years old. The court accepted defendant's guilty plea.

¶ 4 The Iroquois County probation department submitted a presentence investigation report (PSI), which the trial court considered at defendant's sentencing. In a statement included in the PSI, defendant admitted to sexual activity with B.B. and C.L. while each was spending the night at the parsonage where defendant lived. The incidents occurred while defendant was employed as a youth minister at Ashkum United Methodist Church. Reports in the PSI indicated that the church was located at 208 North 3rd Street, in Ashkum, while the church parsonage was located at 303 East Washington Street. Statements from the victims also indicated that all incidents in question took place at the parsonage.

¶ 5 The PSI also included a reference to a child pornography case pending in another jurisdiction. This included a number of photographs from that case, which had allegedly been downloaded onto a church computer. The court overruled defense counsel's objection to the photographs, noting that defendant had admitted to downloading the photographs onto the computer.

¶ 6 The PSI included a victim impact statement from C.L. In the statement, C.L. described the stress that the offense had caused him, including flashbacks and nightmares. B.B.'s mother also wrote a victim impact statement. In the statement, she wrote: "You stole our son from us. You stole his innocence, his faith, his trust, his will to live." She also wrote: "When [B.B.] met you and we found out you were a minister we thought you were going to be good for him, teaching him about God's love. Instead you took it all away from him." The court also considered the fact that one of the victims had brought a lawsuit against the church. With the consent of the parties, the court also considered a number of letters sent to the court by the public.

¶ 7 At sentencing, the State read C.L.'s victim impact statement while B.B.'s mother read her own. C.L.'s parents wrote statements after the filing of the PSI, and the State read those statements to the court. Aside from the PSI and the victim impact statements, the State did not present any formal evidence in aggravation.

¶ 8 Defendant called Charles Shelquist as his first witness in mitigation. Shelquist testified that he was a member of the United Methodist Church clergy, and had served in Onarga, Illinois, from 1997 to 2004. He became acquainted with defendant when defendant was appointed to

the church in Ashkum. Though Shelquist described his relationship with defendant as one of colleagues, he testified that the relationship changed after defendant's arrest: "Upon hearing of his arrest I felt he would probably be feeling isolation and possible disconnect from God so I tried to go see him to see what spiritual care he was receiving because I believe that everybody deserves to have spiritual care." Shelquist explained that he met with defendant once or twice a month, taking communion, talking about scripture, and praying. Shelquist believed that defendant was sincerely remorseful for committing the offenses in question.

¶ 9 Tammy Biltgen testified that she was the director of youth ministry and Christian education at Trinity United Methodist Church in Wilmette. She testified that she was friends with defendant while the two attended classes together at Garrett-Evangelical Theological Seminary. She stayed in contact with defendant following his arrest. Biltgen testified that defendant confided in her and another friend that he was homosexual. Biltgen knew that defendant had pled guilty, but that did not affect her feelings of friendship for him. The parties then stipulated that two further witnesses—both current pastors who attended seminary school with defendant—would give similar testimony to that of Biltgen if called.

¶ 10 Laura Crites testified that she formerly worked as a Methodist pastor at two churches in Iroquois County. She knew defendant both from seminary school and from his time as a pastor in Ashkum. She, too, had remained in contact with defendant after his arrest. Crites opined that defendant lacked the maturity to be the sole pastor at a small-town church. She testified that "if [defendant] did not have the kinds of issues and problems that he ha[d], he would be a gifted pastor the likes of which I have never seen."

¶ 11 Steven Lobacz testified that he was both a United Methodist minister, as well as a board certified psychiatrist. Defendant had revealed to Lobacz during a therapy session that he was attracted to a boy at his church. Lobacz diagnosed defendant with depression and generalized anxiety disorder. He opined that defendant would benefit from further therapy in the future. Lobacz believed that defendant was sincere in his remorse.

¶ 12 The parties stipulated that defendant's parents would testify that defendant had never been a source of problems for them and that defendant would be a good candidate for rehabilitation.

¶ 13 In allocution, defendant admitted that he had sexual intercourse with B.B. Though he admitted to having inappropriate sexual contact with C.L., defendant denied engaging in oral or anal intercourse with him. Defendant recalled that he would pick C.L. up on Sunday mornings, then take him home later in the afternoon following church. Occasionally, C.L. would come to defendant's house on Saturday and stay overnight. B.B., too, would sleep over on weekends. Defendant admitted that "[i]n both cases I destroyed their trust and friendship and broke the promises that I made to them, their families, the church, the community and to my friends and family." Defendant apologized profusely throughout his allocution to the victims, their families, his former congregation, members of the community, and his own family. The themes of prayer, forgiveness, and God's love were recurrent throughout the allocution.

¶ 14 Following arguments, the trial court delivered its remarks, beginning with its consideration of the statutory factors in aggravation and mitigation. The only mitigating factor found by the court was defendant's lack of a criminal history. In aggravation, the court noted that defendant's position of trust was an element of the offense with regard to predatory criminal sexual assault of a child, but not criminal sexual assault. Accordingly, the court considered that aggravating factor only with respect to the second count. The court also found that defendant's

conduct threatened serious harm and that a sentence was necessary to deter others from committing the same offense. Moreover, the court found "that the offense did take place in a house of worship or on the grounds of the same." The court noted that this finding could be considered an aggravating factor, stating that "[it] is not a factor in either one of the charges[,] so it can be considered separately." The court continued: "I think it's aggravating that these offenses were committed in a church and that you used religion to ensnare your victims."

¶ 15     After its brief consideration of the statutory factors, the court began an explanation of how it reached a sentence. In total, the trial court's remarks span 13 uninterrupted pages of the report of proceedings. Because of the importance of the court's full remarks to our analysis, we quote those remarks at length:

> "These are crimes *** of outrage and I think you can imagine the sentence that might be imposed on you if they left you tied to a post uptown and put above it some of the pictures I saw, some of the despicable filth that you left on the Manteno Methodist Church computer. I don't think it would take too long for the good citizens of this area to deal a punishment on you much more severe than my own. And I have struggled mightily to keep my own emotions as a man, as a church goer, as a father in check and I believe that I have done so, but you need to understand that society's worst opprobrium is reserved for people who commit crimes like this. ***
>
> These victims, these boys all came to you through church. The offenses were committed on church property. It happened more than once. They occurred while you were a minister. *** It is clear that you used the cloak of religion to gain access to your victims and to gain the trust of them and their parents."

¶ 16     After stating that it had considered the letters received, including some from ministers, the court explained the role religion played in the case:

> "Ordinarily we don't have religion in court, that's not a rule that I have made, but it's the law. It does, however, seem impossible to avoid it in this case. And I have always thought it ironic that the Bible, which is really a book of laws, is the only law book I know of that's not allowed in court. I have considered these letters *** but I keep coming back to what you did.
>
> You defied 2 churches, 2 houses of the Lord with your depravity and you cast a pall on churchmen everywhere. You have subjected now the Methodist Church and these churches to a lawsuit from one of the most outstanding plaintiff's tort lawyers in Illinois. They want over a million dollars and you brought that on your church that you profess to love. How many children now will be kept out of church and out of youth group because their parents are afraid they are going to be molested? How much harder is it going to be for ministers to gain the trust of parishioners and children? And you have apparently driven at least one of these boys out of the church and away from God, that's according to the victim statement, and that's your fault."

¶ 17     On the topic of forgiveness, the court explained that "an essential part of the church [is] the forgiveness of sin and the reconciliation of the sinner with God." However, the court continued, "there is a difference between the forgiveness of God and the mercy of man." The court declared that defendant had betrayed the church, as well as his family, his friends, the victims, and the victims' families. The court also excoriated defendant for continuing to deny the charges related to C.L.

¶ 18    The court continued: "You might have started out in the Methodist Church *** but I think perversion is your true religion and you are its high priest and there's been enough sacrifice of young men on the alter [*sic*] of depravity by you." The court sentenced defendant to terms of 20 and 10 years' imprisonment on counts I and II, respectively, to run consecutively. The court concluded: "There is nobody worse than a desecrater and a betrayer, especially a minister who does it, who in his actions drives people from God and that's what you did."

¶ 19    Defendant filed a motion to reconsider sentence, which the trial court denied. On direct appeal, we remanded the matter for the filing of a Rule 604(d) certificate (Ill. S. Ct. R. 604(d) (eff. July 1, 2006)) and a *de novo* hearing on defendant's postplea motion. *People v. Rademacher*, No. 3-07-0064 (2007) (unpublished order under Supreme Court Rule 23).

¶ 20    On remand, defendant, again, moved for reconsideration of his sentence. The trial court, again, denied the motion, holding that defendant had to first move to withdraw his guilty plea under *People v. Linder*, 186 Ill. 2d 67 (1999), and Illinois Supreme Court Rule 604(d) (eff. July 1, 2006). Following the denial, defendant filed a *pro se* motion to amend his motion for reconsideration. Newly appointed defense counsel then filed a supplemental motion for reconsideration. The trial court denied the motion, holding that defendant was not legally entitled to challenge his sentence without moving to withdraw his guilty plea. Defendant appealed.

¶ 21    On appeal, the Office of the State Appellate Defender, citing *Linder*, moved to dismiss the appeal because defendant did not file a motion to withdraw his guilty plea. This court allowed the motion. *People v. Rademacher*, No. 3-11-0325 (Oct. 4, 2011) (dispositional order).

¶ 22    Defendant subsequently filed a *pro se* postconviction petition. In his petition, defendant argued, *inter alia*, that the trial court deprived him of his constitutional right to a fair sentencing hearing when it considered in aggravation evidence unsupported by the record. Specifically, defendant contended that the crimes were committed in the parsonage, which does not constitute a "place of worship" under the aggravating factors statute. 730 ILCS 5/5-5-3.2(a)(11) (West 2004). Defendant also alleged that the court violated his constitutional rights by exhibiting a personal and religious bias against him. Defendant further claimed that appellate counsel was ineffective in that counsel's motion to dismiss the appeal deprived defendant of the opportunity to make the above arguments on direct appeal. The trial court dismissed the petition at the first stage of review.

¶ 23                                    ANALYSIS

¶ 24    On appeal, defendant renews the aforementioned arguments from his *pro se* postconviction petition (improper aggravating factor and bias). Upon review, we find that neither of defendant's arguments set forth the gist of a constitutional claim.

¶ 25    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) establishes a three-stage process by which a criminal defendant may challenge his convictions or sentence for violations of state or federal constitutional rights. *People v. Jones*, 211 Ill. 2d 140, 143-44 (2004). At the first stage, a trial court shall summarily dismiss a petition for relief if "the court determines the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2012). We review a trial court's first-stage dismissal of a postconviction petition *de novo*. *People v. Edwards*, 197 Ill. 2d 239, 247 (2001).

¶ 26     A petition is frivolous or patently without merit if it lacks an arguable basis in law or fact. *People v. Alcozer*, 241 Ill. 2d 248 (2011). A petition lacks an arguable basis in law or fact if it "is one which is based on an indisputably meritless legal theory or a fanciful factual allegation." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). At the first stage, a petition is liberally construed and all well-pled facts are taken as true unless affirmatively rebutted by the trial record. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). "Because most petitions are drafted at this stage by defendants with little legal knowledge or training, this court views the threshold for survival as low." *Hodges*, 234 Ill. 2d at 9. Accordingly, it is required only that a *pro se* defendant allege enough facts to make out a claim that is arguably constitutional, or state the "gist" of a constitutional claim. *People v. Allen*, 2015 IL 113135, ¶ 24.

¶ 27                              I. Improper Sentencing Factor

¶ 28     Defendant first argues that the trial court erroneously found a statutory aggravating factor applicable at sentencing. Specifically, defendant points out that his offenses took place in the parsonage, rather than the church itself. Accordingly, defendant argues that the court erred in finding in aggravation that the offense occurred "in a house of worship or on the grounds of the same." This reliance upon an improper factor, defendant contends, rendered his sentencing noncompliant with the basic requirements of due process.

¶ 29                                       A. Error

¶ 30     Section 5-5-3.2 of the Unified Code of Corrections sets forth a number of factors that "may be considered by the court as reasons to impose a more severe sentence." 730 ILCS 5/5-5-3.2(a) (West 2004). One of those factors allows the court to consider in aggravation the fact that "the offense took place in a place of worship or on the grounds of a place of worship, immediately prior to, during or immediately following worship services." 730 ILCS 5/5-5-3.2(a)(11) (West 2004). A "place of worship" is defined as "any church, synagogue or other building, structure or place used primarily for religious worship." *Id.*

¶ 31     "Parsonage" is defined as "the residence of a member of the clergy as provided by the parish or church." Random House Dictionary of the English Language 1413 (2d ed. 1987). In the present case, the record establishes that the church parsonage has a separate address from the church itself. Positing that religious worship is surely not the *primary* use of the parsonage, defendant argues that the trial court erred in finding that this factor in aggravation was applicable to his case. Implicit in defendant's argument is the assumption that the parsonage should not be considered "on the grounds" of the church. Though the State does not argue otherwise, we are compelled to address the issue.

¶ 32     The aggravating factors statute defines "place of worship"; however, it does not define "grounds." 730 ILCS 5/5-5-3.2(a)(11) (West 2004). It is not apparent on the face of the statute whether "grounds" should be strictly interpreted to mean the curtilage of the church, or more broadly interpreted to mean the whole of the church property—a definition that might include the parsonage. Moreover, it is unclear from the record whether the church property at 208 North 3rd Street abuts with the parsonage property located at 303 East Washington Street. We raise these questions merely to illustrate that it is far from certain that any error was committed by the trial court in the present case. We need not presently engage in a full statutory analysis, however, because defendant's claim fails on multiple other grounds.

Even assuming, for the sake of argument, that the trial court erred in finding subsection (a)(11) of the aggravating factors statute applicable to defendant's case, defendant's postconviction claim nevertheless fails because it is not of sufficient constitutional dimension.

The Act provides an opportunity for a defendant to assert that "there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2012). Accordingly, postconviction relief will be denied where defendant's claims are based upon statutory rights or present an otherwise insufficient constitutional dimension. See *People v. Greer*, 212 Ill. 2d 192, 203-04 (2004).

In the present case, the aggravating factor applied by the trial court is, of course, a creature of statute. See 730 ILCS 5/5-5-3.2(a) (West 2004). Defendant maintains, however, that sentencing based upon an improper factor undermined his fundamental right to liberty, and that his claim is "of course of constitutional dimension."

The alleged excessiveness of a sentence that is within statutory limits does not create a constitutional issue that may serve as the basis for postconviction relief. *People v. Boyd*, 347 Ill. App. 3d 321, 331 (2004). Our supreme court has suggested that whether a sentence conforms to statute is key in determining whether a constitutional question has been raised. *People v. Sluder*, 40 Ill. 2d 559, 561 (1968) ("[T]he sentence imposed is within the statutory limits prescribed for the offense to which the defendant had pleaded guilty, and this issue does not involve a constitutional question."). In *People v. Del Vecchio*, 129 Ill. 2d 265, 293 (1989), the supreme court, on appeal from the dismissal of a postconviction petition, refused to reach the issue of whether a juvenile offense could be used in aggravation because, *inter alia*, "it involves a question of statutory construction and not a constitutional matter." See also *People v. Kessinger*, 133 Ill. App. 3d 831, 832, 834 (1985) (refusing to consider erroneous imposition of extended-term sentence on grounds that it did not rise to the level of a constitutional deprivation). Even the complete lack of a hearing on factors in aggravation and mitigation does not rise to the level of a constitutional deprivation because, as our supreme court has often stated, " 'the statute providing for a hearing in aggravation and mitigation *** does not confer any constitutional rights.' " *People v. Scott*, 49 Ill. 2d 231, 234 (1971) (quoting *People v. Wilbourn*, 48 Ill. 2d 187, 190 (1971)).

The error alleged here by defendant would not rise to the level of a constitutional deprivation because any such error is one created solely by statute. Defendant here allowed his victims to spend the night at his house, which was property owned by the church. He proceeded to perform sexual acts on the victims in that house before taking them to church the next morning. In the trial court's words, defendant "used religion to ensnare [his] victims." That the trial court reasonably cited this pattern of behavior in aggravation does not offend either the federal or state constitution. Any purported error was only committed insofar as the facts of defendant's case do not line up with the language and definitions set forth in subsection (a)(11) of the aggravating factors statute. 730 ILCS 5/5-5-3.2(a)(11) (West 2004). In other words, but for the existence of that statute, there could be no claim of error.[1] Accordingly, the

---

[1]A trial court is free to consider factors in aggravation that are not specifically listed in a statute. *E.g.*, *People v. Allen*, 119 Ill. App. 3d 845, 846 (1983). Thus, even if the parsonage in the present case did not satisfy the aggravating factors statute, the court was free to consider defendant's behavior as a nonstatutory aggravating factor.

issue raised by defendant is one of statutory construction, and is not an issue of constitutional deprivation.

¶ 39     In coming to this conclusion, we reject defendant's reliance upon *People v. Martin*, 119 Ill. 2d 453 (1988), and *People v. Reed*, 376 Ill. App. 3d 121 (2007). Each of those cases was decided on direct appeal, and thus did not involve postconviction proceedings under the Act. Defendant's cited authority does nothing to refute our supreme court's well-settled position that matters of statutory interpretation are not of sufficient constitutional dimension as required by the Act. See *Kessinger*, 133 Ill. App. 3d at 834.

¶ 40                                 C. Prejudice

¶ 41     Though our finding that defendant's improper aggravating factor argument did not raise a constitutional issue is dispositive, we must note that his argument would fail on another ground as well. That is, even assuming—again, *arguendo*—that the issue was of sufficient constitutional dimension, defendant's contention that he was arguably prejudiced by the allegedly erroneous finding is affirmatively rebutted by the record.

¶ 42     A sentencing court's consideration of an improper factor in aggravation warrants relief only when a defendant can demonstrate that he or she was prejudiced by the court's consideration of that factor. *Reed*, 376 Ill. App. 3d at 128. To obtain remand for resentencing, a defendant "must show more than the mere mentioning of an improper fact." *Id.* "An isolated remark made in passing, even though improper, does not necessarily require that defendant be resentenced. [Citation.] Rather, defendant must show that the trial court relied on the improper fact when imposing sentence." (Internal quotation marks omitted.) *Id.*

¶ 43     Of course, the pleading standards at the first stage of proceedings under the Act are low. *Hodges*, 234 Ill. 2d at 9. Accordingly, defendant need not outright establish that he was prejudiced by the alleged error, but merely establish an arguable basis for such prejudice. See, *e.g.*, *id.* at 16. All well-pled facts in defendant's petition are taken as true unless affirmatively rebutted by the record. *Coleman*, 183 Ill. 2d at 381.

¶ 44     In the present case, defendant's argument—that the trial court's consideration of an improper aggravating factor was prejudicial—is affirmatively rebutted by the record. In the court's lengthy explanation of the sentence, it detailed the damage done by defendant to the victims, their families, the church, and the community. The court's comment, that the statutory aggravating factor in question was applicable, was a *de minimis* portion of the court's remarks. Moreover, despite the heinous nature of defendant's crimes, and the obvious consideration the trial court gave to that fact, the court sentenced defendant to an aggregate term of 30 years' imprisonment—5 years fewer than the maximum term allowed under defendant's plea deal. It strains credulity to think that the court's passing reference to the applicability of a statutory aggravating factor played any appreciable role in defendant's sentence. Defendant has pointed only to the mere mention of an allegedly improper factor. Any inference of prejudice to be drawn from that passing remark is affirmatively rebutted by the record.

¶ 45                         II. Personal and Religious Bias

¶ 46     Defendant next contends that he stated the gist of a constitutional claim when, in his postconviction petition, he argued that the trial court exhibited personal and religious bias against him at sentencing. In support of his claim, defendant cites numerous examples of the

court's statements at sentencing. See, *e.g.*, *supra* ¶¶ 16-19. Defendant claims that these statements, including the court's repeated references to church and religion, exemplify the "judge's active, personal or religious 'animosity, hostility, ill will or distrust' toward [defendant]."

¶ 47 A sentencing hearing is fundamentally unfair—and due process is denied—when the proceeding is affected by judicial bias. See *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997). Such is the result regardless of whether the ultimate sentence imposed was within the statutory limits. *E.g.*, *Townsend v. Burke*, 334 U.S. 736, 741 (1948). Similarly, a sentencing hearing will be found fundamentally unfair where religion is a factor in the sentence imposed. See *Zant v. Stephens*, 462 U.S. 862, 885 (1983). In *People v. Vance*, 76 Ill. 2d 171 (1979), our supreme court cautioned that "[r]eviewing court judges should be chary of condemning as motivated by prejudice those actions of trial judges which may represent only a difference of opinion as to the seriousness of a particular offense in the context of community conditions." *Id.* at 181. The court held that " 'something more' " than an unfavorable result to the defendant is required to demonstrate bias or prejudice on the part of the trial court. *Id.* The court described that " 'something more' " as "a showing of animosity, hostility, ill will, or distrust towards [a] defendant." *Id.*

¶ 48 The trial court's remarks in the present case do not evince any animosity, hostility, ill will, or distrust toward defendant. The court condemned defendant and his actions in the strongest possible terms. The court described the outrage felt in the community stemming from defendant's crimes. Still, the record demonstrates that the court fairly considered all of the evidence presented at trial and, despite its harsh rhetoric, imposed a sentence significantly under the maximum aggregate term that defendant faced. Defendant was convicted of using his position as a youth minister to engage in sexual contact with two young boys. These crimes warranted harsh criticism from the trial court. We hold that harsh criticism, based on the particular facts of a defendant's case, does not constitute any sort of evidence of prejudice derived from personal bias.

¶ 49 Furthermore, the court's references to religion did not reflect any religious animosity or ill will toward defendant. To be sure, the court's repeated references to religion and church are more than is commonly seen in a sentencing hearing. However, these references were plainly invited by defendant. After calling six clergy members to testify in mitigation, defendant's lengthy statement in allocution was ripe with religiosity. Having invited a sentencing hearing teeming with religion, defendant may not now argue that the trial court's references to that topic deprived him of due process. More importantly, a number of factors cited by the trial court in aggravation necessarily related to religion, namely that defendant used religion to ensnare his victims, that defendant's crimes were committed on church property, and that child pornography was found on a church computer. On the facts of this case, it would have been virtually impossible for the court to avoid mentioning church or religion in sentencing. The trial court simply could not reference those factors without referencing religion. Defendant's claims that the trial court exhibited personal or religious bias against him are thus affirmatively rebutted by the record.

¶ 50 III. Ineffective Assistance of Appellate Counsel

¶ 51 Finally, defendant argues that "[i]f this Court concludes the constitutional issues are forfeited," we should find that his argument that appellate counsel was ineffective was not

frivolous or patently without merit. Though we have *not* found that defendant's prior arguments were forfeited, instead resolving those issues on their merits, we will nevertheless address defendant's ineffectiveness claim.

¶ 52 Claims of ineffective assistance of appellate counsel are cognizable under the Act and are analyzed under the same rubric as claims of ineffective assistance of trial counsel. *People v. Mack*, 167 Ill. 2d 525, 531-32 (1995). In order to prevail on a claim of ineffective assistance of appellate counsel, a defendant must show "(1) that counsel's performance was deficient or fell below an objective standard of reasonableness; and (2) that defendant suffered prejudice as a result of counsel's deficient performance." *Id.* at 532 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). In order to prove prejudice stemming from the deficient performance of appellate counsel, a defendant must show that there was a reasonable probability that, but for that deficient performance, the sentence or conviction would have been reversed. *People v. Olinger*, 176 Ill. 2d 326, 356 (1997). A petition will not be dismissed at the first stage of proceedings under the Act if it provides an arguable basis for each of those prongs. *Hodges*, 234 Ill. 2d at 17.

¶ 53 Defendant failed to show that he was arguably prejudiced by appellate counsel's allegedly deficient performance. As explained in our analysis above, had defendant's arguments been presented on direct appeal, they would not have resulted in the reversal of his conviction or sentence. As to defendant's improper factors argument, the record is completely devoid of any indication that defendant suffered any prejudice—a requirement if a defendant is to obtain relief based upon improper sentencing factors. See *supra* ¶¶ 41-44. Moreover, defendant's bias argument would have failed because it was completely rebutted by the record. See *supra* ¶¶ 46-49.

¶ 54 Defendant's prejudice argument fails on a second, more subtle ground as well. The argument presumes that but for counsel's motion to dismiss the appeal, this court would have reached the merits on direct appeal. It is well settled, however, that a defendant's failure to comply with Rule 604(d) precludes the appellate court from considering the merits of a defendant's appeal. *People v. Flowers*, 208 Ill. 2d 291, 300-01 (2003). This court, having been of the opinion that it was precluded from considering the merits of defendant's appeal, presumably would have reached that conclusion whether or not counsel raised it in a motion.

¶ 55 Defendant's failure to show arguable prejudice is dispositive. See *People v. Hale*, 2013 IL 113140, ¶ 17 (allowing that a reviewing court may decide ineffectiveness claim on prejudice prong "without addressing counsel's performance"). Even so, we feel compelled to address the issue of appellate counsel's allegedly deficient performance. Defendant's argument is premised upon appellate counsel's motion to dismiss the appeal pursuant to Rule 604(d). That motion, of course, was granted and its legal position endorsed by this court. Defendant's argument then, in essence, is that this court erred in granting the motion. He contends that Rule 604(d) requires a motion to withdraw a guilty plea only where a defendant seeks to challenge his sentence as excessive. Defendant maintains that he challenges his sentence not as excessive but as improper.

¶ 56 In *People v. Evans*, 174 Ill. 2d 320 (1996), our supreme court held that the requirement of Rule 604(d)—that a defendant wishing to appeal his sentence first file a motion to reconsider that sentence—did not apply in the context of fully negotiated guilty pleas. In holding that such a defendant must file a motion to withdraw the guilty plea, the court reasoned that "[t]o permit a defendant to challenge his sentence without moving to withdraw the guilty plea in these

instances would vitiate the negotiated plea agreement he entered into with the State." *Id.* at 332. Three years later, in *Linder*, 186 Ill. 2d at 74, the court extended the reasoning in *Evans* to the context of partially negotiated guilty pleas, where a defendant pleads guilty in exchange for a cap on the possible sentence. The *Linder* court explained:

> "By agreeing to plead guilty in exchange for a recommended sentencing cap, a defendant is, in effect, agreeing not to challenge any sentence imposed below that cap on the grounds that it is excessive. See *People v. Catron*, 285 Ill. App. 3d 36, 37 (1996) (defendant who agrees to a potential range of sentences implicitly concedes that a sentence imposed within the range cannot be excessive). While the defendant may not like the sentencing court's ultimate disposition, that is a risk he assumes as part of his bargain. A defendant who is unwilling to accept that risk should not agree to a cap rather than a fixed term. Where the sentence imposed is within the agreed upon cap, as the sentences here were, allowing the defendant to seek reconsideration of his sentence without also moving to withdraw his guilty plea unfairly binds the State to the terms of the plea agreement while giving the defendant the opportunity to avoid or modify those terms. That is precisely the situation the *Evans* rule was designed to prevent." *Id.*

Rule 604(d) was subsequently amended to its present form, which holds that "[n]o appeal shall be taken upon a negotiated plea of guilty challenging the sentence as excessive unless the defendant, within 30 days of the imposition of sentence, files a motion to withdraw the plea of guilty and vacate the judgment." Ill. S. Ct. R. 604(d) (eff. July 1, 2006).

¶ 57        Following *Linder* and the amendment to Rule 604(d), some courts have taken the position espoused here by defendant. Most recently, the Fourth District, in *People v. Palmer-Smith*, 2015 IL App (4th) 130451, ¶ 28, drew a distinction between *excessive* sentencing and *improper* sentencing. The court explained that the defendant in that case had argued that the trial court "engaged in improper sentencing as opposed to excessive sentencing. Such a specific challenge is not barred by Rule 604(d) ***." *Id.* In *dicta*, the Second District cited *Palmer-Smith* with approval, stating that a defendant could challenge his sentence—via postplea motion and via appeal—without moving to withdraw his guilty plea "as long as the motion and the appeal are based on something other than a contention that the sentence is merely excessive." *People v. Martell*, 2015 IL App (2d) 141202, ¶ 10.

¶ 58        We respectfully disagree with those courts. Any distinction between excessive sentencing and improper sentencing is one without any practical difference. By way of illustration, defendant here must show that the allegedly improper considerations by the trial court were prejudicial. That is, he must show that those considerations led to a sentence that was—of course—excessive. Any "improper sentencing" argument is, by its very nature, an implicit argument that the sentence imposed was excessive. In other words, as the trial court in the present case aptly noted, any distinction between improper and excessive "is merely a play on words—any sentence which is unfair or the result of bias is[,] by definition, excessive."

¶ 59        Virtually any excessive sentencing argument could be easily converted to an improper sentencing argument. This position would completely undermine the holding in *Linder*, where the court held that, when the sentence imposed is within the agreed upon range, "allowing the defendant to seek reconsideration of his sentence without also moving to withdraw his guilty plea unfairly binds the State to the terms of the plea agreement while giving the defendant the opportunity to avoid or modify those terms." *Linder*, 186 Ill. 2d at 74.

¶ 60    Moreover, drawing a distinction between improper sentencing and excessive sentencing would completely swallow the withdrawal requirement of Rule 604(d), reducing that requirement to nothingness in the context of partially negotiated pleas. We cannot imagine the attorney unable to convert an "excessive" sentencing claim into an "improper" sentencing claim. We are unaware of any excessive sentence claims wherein the defendant argues "the trial judge did everything correctly, fairly considered all the appropriate factors in aggravation and mitigation, only considered relevant and admissible evidence, *etc.*, *etc.*, but, doggone it, the sentence is still just too long." "The main purpose behind the promulgation of Rule 604(d) was to reduce the large number of appeals being taken from guilty pleas." *Evans*, 174 Ill. 2d at 329. Allowing defendants to appeal "improper" sentences imposed pursuant to partially negotiated pleas without moving to withdraw their plea would open the floodgates to appeals from such pleas. Also, this procedure would deny the State the benefit of its bargain. The result would thus be completely contrary to the stated purpose of that rule.

¶ 61    To the extent that there should be exceptions to the holding in *Linder* or to Rule 604(d), we believe those exceptions should be carved out explicitly by our supreme court, rather than *ad hoc* by the appellate courts.

¶ 62                                      CONCLUSION

¶ 63    For the foregoing reasons, the judgment of the circuit court of Iroquois County is affirmed.

¶ 64    Affirmed.

¶ 65    JUSTICE WRIGHT, specially concurring.

¶ 66    I concur in the result but take no position with respect to the views expressed in paragraphs 54-61.